| | | |
|---|---|---|
| **LORI A. CANNON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:13cv0021 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying Lori A. Cannon's application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383b. All matters are pending before the undersigned United States Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c).

<u>**Procedural History**</u>

Lori A. Cannon (Plaintiff) applied for SSI in July 2010, alleging that she became disabled on March 1, 1992, because of human immunodeficiency virus (HIV), Ehlers-Danlos syndrome (EDS), sleep disorder, depression, chronic obstructive pulmonary disease (COPD), and learning disabilities. (Tr. at 142-50, 192.) On October 15, 2010, the Social Security Administration denied Plaintiff's claim for benefits. (Id. at 75, 83-87.) Upon Plaintiff's request, a hearing was held before an administrative law judge (ALJ) on February 24, 2012, at which Plaintiff and a vocational expert testified. (Id. at 30-74.) On

February 29, 2012, the ALJ issued a decision denying Plaintiff's claim for benefits, finding vocational expert testimony to support a finding that Plaintiff could perform work in the national economy as a plastic products assembler, electronics accessory assembler, and automotive parts assembler. (Id. at 12-25.) On January 25, 2013, upon review of additional evidence, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Id. at 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, Plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, Plaintiff argues that the ALJ erred in determining her residual functional capacity (RFC) inasmuch as he improperly weighed the medical opinion evidence of record. Plaintiff also claims that the ALJ's RFC determination is flawed inasmuch as the ALJ failed to consider the effects of Plaintiff's obesity on her ability to work, especially when considered in combination with Plaintiff's EDS and sleep apnea. Plaintiff requests that the final decision be reversed and that she be awarded benefits, or that the matter be remanded for further consideration.

Because the ALJ committed no legal error and substantial evidence on the record as a whole supports the ALJ's decision, the Commissioner's final decision that Plaintiff was not disabled is affirmed.

## Testimonial Evidence Before the ALJ

At the hearing on February 24, 2012, Plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, Plaintiff was forty-eight years of age.  Plaintiff stands 5 feet, 5 inches tall and weighs 191 pounds.  Plaintiff left school in the eleventh grade and obtained a General Equivalency Degree (GED).  Plaintiff lives in a house with her husband.  Plaintiff has no minor children living at home with her.  (Id. at 34-37.)

Plaintiff testified that she worked for a short time in 1994 at a rehabilitation facility but has not worked since that time nor looked for work.  (Id. at 39-40.)

Plaintiff testified that she has suffered from a developmental reading and expressive writing disorder since grade school and that she was enrolled in learning disability classes beginning in sixth grade.  Plaintiff testified that she continues to have difficulty with spelling and is a slow reader.  (Id. at 42-43.)  Plaintiff testified that she can understand instructions as long as spelling is not involved, but that she may have difficulty following detailed or multi-step instructions.  (Id. at 50-51.)

Plaintiff testified that she has experienced depression intermittently since 1987. Plaintiff testified that she often has days during which she does not want to get out of bed, and she will not get out of bed unless she must go somewhere.  Plaintiff testified that her symptoms vary in that at times she sleeps too much and then at other times cannot sleep; that she overeats on occasion and then at times cannot eat; and that her moods "jump up and down."  Plaintiff testified that she does not like to be around people and avoids public and social situations.  Plaintiff testified that she sometimes has difficulty concentrating.

Plaintiff testified that she previously took Prozac for her condition and was recently prescribed amitriptyline.  (Id. at 43-45, 49, 60-62.)

Plaintiff testified that she also suffers from an anxiety disorder and experiences panic attacks.  Plaintiff testified that she cannot breathe during an attack.  Plaintiff testified that she also experiences dread and is uncomfortable in social situations.  Plaintiff testified that she thinks that other people judge her, and she easily becomes angry with other people.  Plaintiff testified that she also has some obsessions, intrusive thoughts, and exhibits hoarding behavior.  (Id. at 46-48.)  Plaintiff testified that she stays away from her younger grandchildren so she does not do anything "crazy" in front of them.  (Id. at 48-49.)  Plaintiff testified that her inability to be around many people prevents her from working.  (Id. at 50.)

Plaintiff testified that she was diagnosed with HIV in 1992 for which she takes medication on a daily basis.  Plaintiff testified that she has no known symptoms from HIV but experiences diarrhea, which she believes may be a side effect from the medication.  Plaintiff testified that she tires easily but could not attribute her fatigue to HIV.  (Id. at  51-52.)

Plaintiff testified that she has had emphysema for thirteen years and was diagnosed with COPD in February 2010, which resulted in her hospitalization.  Plaintiff testified that she was also hospitalized for COPD in January 2011.  Plaintiff testified that she experiences a lot of coughing, shortness of breath, fatigue, and discoloration of her fingernails.  Plaintiff testified that the condition causes her to have difficulty recovering from secondary infections.  Plaintiff testified that she has oxygen for the condition, which

helps some. Plaintiff testified that she uses her oxygen continuously when she has an exacerbation of symptoms. (Id. at 53-54.)

Plaintiff testified that she has had EDS since birth, which causes joint pain and injury-prone skin. Plaintiff testified that she is easily cut and has achy joints because of the condition. (Id. at 55-56.) Plaintiff testified that she takes Aleve for her pain because prescription medication did not help her in the past. Plaintiff testified that she also has carpal tunnel syndrome for which she wears wrist bands. (Id. at 57-58.)

Plaintiff testified that she suffers from sleep apnea and that sleep study results showed that she needed a CPAP machine. Plaintiff testified that she never obtained the machine because of lack of finances. (Id. at 57-58.)

As to exertional limitations, Plaintiff testified that she could not lift anything because such activity would cause aching pain in her wrists, elbows, and shoulders. (Id. at 57.) Plaintiff testified that she was uncertain of the distance she could walk because of environmental factors, testifying further that she has difficulty being outside when it is humid or there is high pollen. Plaintiff testified that she also has difficulty being near mold or mildew. Plaintiff testified that she sometimes rides a motorized cart at the grocery store. (Id. at 54.)

Plaintiff testified that she used to sew and make crafts but is no longer able because of wrist pain. (Id. at 59.) Plaintiff testified that she has a driver's license and drove eighty miles to the administrative hearing. Plaintiff testified that it took her an hour and forty-five minutes to make the drive and that she had no problems along the way. Plaintiff

testified that she drives whenever she needs to go somewhere and that she sometimes drives to Quincy, Illinois, to visit her children and her husband's mother. (Id. at 36.)

Plaintiff testified that she was previously awarded SSI benefits and received such benefits until September 2006. Plaintiff testified that her benefits were terminated on account of matters unrelated to the determination of disability.[1] Plaintiff testified that the severity of her symptoms have worsened since that time. (Id. at 59-64.)

Michael J. Weissman, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

The ALJ asked Mr. Weissman to assume an individual of the same age, education, and work experience as Plaintiff and to further assume the individual to be limited to light work. The ALJ asked Mr. Weissman to further assume that the individual needed

> to avoid all exposure to irritants such as fumes, odors, mold, gases, poorly ventilated areas. Additionally, they need to be limited to work that is simple routine tasks where the individual can carry out non-detailed instructions, a work in a low-stressed job. And I define low-stress job as only occasional decision-making, only occasional changes in a work setting, and only occasional judgment as required on the job. Further, I want to limit this . . . hypothetical individual, to only occasional interaction with the public, only occasional interaction with coworkers, and only occasional interaction with supervisors. And finally, in terms of climbing rope, ramps and stairs, ladders, ropes, scaffolds, stooping, kneeling, crouching, and crawling, those should all be limited to occasional.

(Id. at 68-69.)

After clarifying that such a person would need to avoid only concentrated exposure to the environmental elements listed, Mr. Weissman testified that the person could perform unskilled work as a plastic product assembler, of which 394 such jobs exist in the

---

[1]The ALJ alluded that the termination of benefits was related to an overage of assets. (Id. at 64.)

State of Missouri and 39,687 nationally; as an electronics accessory assembler, of which 4,824 such jobs exist in the State of Missouri and 172,345 nationally; and as an automobile parts assembler, of which 643 jobs exist in the State of Missouri and 175,000 nationally. (Id. at 69-70.)

The ALJ then asked Mr. Weissman to consider an individual who could not handle low-stress jobs and who would need a sit-stand option at will. The ALJ asked Mr. Weissman to further assume that this individual would need

> at least two to three unscheduled breaks during a normal eight-hour workday in addition to the regularly scheduled breaks. And that they should avoid concentrated exposure to cold, extreme cold, extreme heat, high humidity, perfumes, solvents, cleaners, chemicals, avoid all exposure to fumes, odors, dust, gases, cigarette smoke, looks like soldering fluxes, that, in addition, the person can lift less than 10 pounds occasionally, never lift 20 pounds or above, and they would additionally, in terms of their abilities, to use their hands. Grasping, turning, twisting objects 25 percent of the time they could do that during an eight-hour workday, 25 percent of the time, they can do fine finger manipulation, and 25 percent of the time, they can use their arms for reaching, the rest of the time, according to the statement, I guess they would not be able to use their arms. And additionally, they're going to miss one day per month.

(Id. at 71-72.)

Mr. Weissman testified that such a person could not perform any job. (Id. at 72.)

Finally, the ALJ asked Mr. Weissman to assume an individual who would miss work at least three days per week, to which Mr. Weissman testified that such a person could not perform any job. (Id.)

## Medical Evidence Before the ALJ

On October 29, 1992, Plaintiff underwent a consultative psychological consultation and intellectual evaluation for disability determinations. Plaintiff reported her history of

learning difficulties and special education programs, as well as her history of depression and fatigue. Plaintiff reported that she currently did not feel depressed but that her mood depended on her husband's mood. Dr. Tracey A. Knight noted Plaintiff's scores on the WAIS-R test to be consistent with the presence of learning disabilities. Dr. Knight noted there to be no evidence of ongoing depression but that Plaintiff was in a troubled marriage. Dr. Knight also noted it to be unclear what, if any, manifestations of HIV Plaintiff experienced although the condition could lead to fatigue. Dr. Knight did not diagnose Plaintiff with any mental impairment but reported that she had marital problems. Dr. Knight opined that Plaintiff was capable of doing simple assembly and more complex tasks under supervision; and was capable of comprehending, retaining, and recalling moderately complex and moderately detailed work instructions. Dr. Knight noted there to be no evidence that Plaintiff would have difficulty getting along with co-workers and supervisors. Dr. Knight noted Plaintiff to be physically weakened and fatigued, resulting in some limitations in coping with even mild work pressures. Finally, Dr. Knight noted that Plaintiff would have difficulty with jobs requiring reading and spelling. (Id. at 251-53.)

Plaintiff visited Dr. Donald C. Doll on March 12, 2009, for follow up of her HIV. Dr. Doll noted Plaintiff to have been diagnosed ten years earlier and that she currently experienced no effects from the condition. Plaintiff reported having no problems with her medication, and she was continued on Atripla. (Id. at 256-61.)

Plaintiff was admitted to the emergency room at University Hospital on June 16, 2009, with complaints of mild pain and swelling of the left foot. Examination showed

redness and minimal swelling with abrasions between the toes. Plaintiff was diagnosed with cellulitis and was prescribed Minocycline. Plaintiff was discharged that same date in improved and stable condition. (Id. at 389-91.)

Plaintiff was admitted to the emergency room at University Hospital on January 27, 2010, with complaints of left-sided numbness and weakness. It was noted that the symptoms resolved without intervention. Plaintiff's medications were noted to be Acyclovir, Aleve, and Minocycline. Physical examination showed Plaintiff's reflexes to be absent. Finger-to-nose coordination was noted to show abnormal movement. Otherwise, examination was unremarkable, including normal examination of the back and musculoskeletal system with normal range of motion and no tenderness. Subsequent examination showed normal coordination and 2/4 reflexes bilaterally. Mental status examination showed Plaintiff's affect, judgment, and insight to be normal. A CT scan of the head showed bilateral enlarged parotid gland nodes consistent with history of HIV. A chest x-ray was normal. Plaintiff was discharged in improved condition and was given aspirin upon discharge. (Id. at 374-88.)

Plaintiff visited MedZou Community Health Clinic (MedZou) on January 28, 2010, with complaints of congestion, productive cough, shortness of breath, wheezing, low energy, and abdominal pain. Plaintiff's medical history was noted, including depression, but Plaintiff reported having no recent depression or anxiety. Physical examination showed coarse breath sounds with diffuse expiratory wheezes. Examination of the extremities showed many scars on the shins but no edema. With respect to

musculoskeletal examination, Plaintiff reported that she felt weaker. Plaintiff was prescribed Doxycycline, Albuterol, Prednisone, and Ipratropium. (Id. at 302.)

Plaintiff visited Drs. William L. Salzer and David McCrary at University Hospital on February 2, 2010, for follow up of HIV. Plaintiff reported that she had not taken Atripla since September 2009 because of financial issues. Plaintiff reported shortness of breath upon exertion and climbing a flight of stairs. Physical examination showed occasional expiratory wheezes bilaterally, but was otherwise normal. No clubbing, cyanosis, or edema was noted about the extremities. Plaintiff was restarted on Atripla and was advised to undergo an echocardiogram and take aspirin daily in light of her recent episode of possible transient ischemic attack. (Id. at 364-73.)

Plaintiff underwent an echocardiogram on February 5, 2010, the results of which were normal. (Id. at 358-61.) A carotid ultrasound performed that same date showed minimal plaque formation bilaterally. (Id. at 362-63.)

Plaintiff was admitted to University Hospital on February 25, 2010, with complaints of productive cough, shortness of breath, and wheezing. Plaintiff also complained of chronic diffuse fatigue. Bronchial thickening was noted on chest x-rays with no evidence of pneumonia. Plaintiff was given high-dose steroids and nebulizer treatment and was discharged that same date. Plaintiff was diagnosed with COPD exacerbation. Plaintiff's discharge medications were noted to be Naproxen, aspirin, Atripla, Medrol Dosepak, Zithromax, Azithromycin, and Albuterol. (Id. at 325-57.)

Plaintiff was readmitted to University Hospital on February 26, 2010, with complaints of shortness of breath and wheezing. Plaintiff's past medical history of HIV,

EDS, and reactive airway disease because of COPD was noted.  It was noted that Plaintiff recently had a COPD exacerbation for which she was hospitalized but did not take her medications upon discharge because they were too expensive.  A CT scan of the chest showed no pulmonary embolism, but moderate emphysematous changes and moderate diffuse atypical appearing pneumonic infiltrates were noted.  During her hospitalization, it was noted that Plaintiff was de-saturating upon exertion, and home oxygen was prescribed.  Plaintiff was discharged on March 2, 2010.  Plaintiff's medications upon discharge were noted to be Albuterol, aspirin, Azithromycin, Atripla, Fluconazole, Advair, Medrol Dosepak, Aleve, and Prednisone.  (Id. at 262-88.)

Plaintiff visited MedZou on March 11, 2010, for follow up of her recent hospitalization.  Physical examination, including musculoskeletal examination, was unremarkable.  Plaintiff reported feeling down.  Plaintiff was advised as to proper medication usage.  (Id. at 300-01.)  On March 15, Plaintiff was instructed to continue with Advair and Combivent.  (Id. at 294-95.)

Plaintiff visited Dr. McCrary at University Hospital on March 30, 2010, for follow up.  It was noted that Plaintiff used oxygen for ambulation but continued to experience tightness and shortness of breath.  Plaintiff reported increased sleepiness and stated her belief that she was depressed.  Physical examination, including examination of the extremities, was unremarkable.  Laboratory testing was ordered for Plaintiff's HIV.  It was noted that Plaintiff was currently using inhalers for COPD and was awaiting application for Medicaid in order to undergo pulmonary function testing.  Plaintiff was diagnosed with depression for which Fluoxetine was prescribed.  On April 29, 2010, Plaintiff's dosage of

Fluoxetine was increased after Plaintiff reported that the medication did not seem to help. (Id. at 318-22.)

Plaintiff returned to MedZou on May 27, 2010, and complained of a three-week history of swelling and redness in her right foot. Plaintiff also complained of chest tightness and exertional dyspnea, joint pains, carpal tunnel, and feeling depressed. Plaintiff reported that she was taking an antidepressant that did not seem to be working. Physical examination showed redness and mild edema of the right foot. Chronic skin abnormalities were also noted due to EDS. Examination of the lungs showed decreased air movement. Plaintiff was diagnosed with acute gout of the foot, and Prednisone was prescribed. Plaintiff was also diagnosed with depression for which Plaintiff was instructed to follow up with Dr. Salzer. (Id. at 291-93.)

Plaintiff returned to Dr. McCrary on July 20, 2010, for follow up. Plaintiff reported her breathing to have improved. Plaintiff complained of fatigue, snoring, and lower extremity edema. Dr. McCrary questioned underlying obstructive sleep apnea. Physical examination showed occasional wheezes at the base of the lungs but was otherwise normal. Plaintiff was instructed to continue with her medications for HIV and COPD. (Id. at 309-12.)

On October 11, 2010, Barbara Markway, Ph.D. completed a Psychiatric Review Technique Form for disability determinations in which she opined that Plaintiff's impairment of depression was not severe inasmuch as it caused only mild restrictions in Plaintiff's activities of daily living; no difficulties in maintaining social functioning and in

concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration. (Id. at 396-407.)

Plaintiff was admitted to Blessing Hospital on January 1, 2011, with complaints of shortness of breath and productive cough. Plaintiff's past medical history was noted. It was noted that Plaintiff was no longer on oxygen because of lack of insurance. Physical examination showed Plaintiff to have occasional rhonchi and diminished air, bilaterally. A CT scan of the chest showed pulmonary emphysema and bronchiolitis/pneumonia. Chest x-rays showed prominent bronchovascular markings at the right lung base. Plaintiff was diagnosed with acute exacerbation of COPD secondary to viral bronchitis with possible secondary bacterial infection. Plaintiff was given an antibiotic and was continued on steroid medication and bronchodilators. Upon learning that Plaintiff's infection was not bacterial pneumonia, steroid medication and antibiotics were discontinued. (Id. at 409-19, 433-34.)

Plaintiff was admitted to the emergency room at Blessing Hospital on June 29, 2011, with complaints of left leg pain. Plaintiff reported the pain to be at a level four on a scale of one to ten and to increase with walking. Plaintiff reported that she had planned to go to Six Flags that day. Physical examination, including respiratory examination, was unremarkable. Plaintiff was diagnosed with phlebitis and was discharged that same date. (Id. at 420-22.)

Plaintiff was admitted to the emergency room at University Hospital on October 11, 2011, with complaints of left-sided numbness and chest pain. It was noted that Plaintiff's symptoms resolved without intervention. Physical examination was

unremarkable. X-rays of the head and chest yielded normal results. Psychiatric review showed Plaintiff to be cooperative and to have appropriate mood and affect. Plaintiff reported being under a lot of stress. It was noted that Plaintiff had a history of depression but was not taking medication for the condition. Plaintiff was discharged that same date in stable condition. Plaintiff's discharge diagnosis was stress reaction. (Id. at 440-52, 458-60.)

Plaintiff visited Dr. Salzer on October 11, 2011, for HIV follow up. It was noted that Plaintiff had no active issues and denied any recent symptoms, including shortness of breath and dyspnea on exertion. Physical examination was unremarkable. Plaintiff's lungs were clear to auscultation. Examination of the extremities showed normal muscle strength and no edema. Plaintiff was noted to have normal mood and affect. Plaintiff reported that she was applying for social security benefits to help pay for her medications. Plaintiff's current medications were noted to be Albuterol and Advair. Dr. Salzer diagnosed Plaintiff with HIV, which was noted to be stable; COPD, for which Plaintiff used nebulizer treatment when needed but stopped using Advair because of its reported ineffectiveness; and obstructive sleep apnea, as diagnosed with a sleep study. Plaintiff reported that she could not afford a CPAP machine for her sleep apnea condition. (Id. at 461-62.)

On November 1, 2011, Dr. Thomas Hovenic completed an RFC Questionnaire in which he stated that he had been treating Plaintiff for HIV for one month, and that he was an attending physician with Dr. Salzer for two years prior. Dr. Hovenic noted Plaintiff's diagnoses to be HIV, COPD, EDS, obstructive sleep apnea, and depression. Dr. Hovenic

- 14 -

reported that Plaintiff experienced swelling and tenderness about the joints, and specifically, the wrists, elbows, shoulders, neck, spine, hips, knees, and ankles. Dr. Hovenic also reported that Plaintiff suffered severe fatigue. Dr. Hovenic reported that Plaintiff experienced unilateral numbness and weakness because of psychosocial stressors. Dr. Hovenic reported that Plaintiff's symptoms often interfered with her attention and concentration. Dr. Hovenic opined that Plaintiff could not tolerate even low stress jobs because of her limited ambulatory capacity secondary to shortness of breath and because of stress-induced weakness and numbness as evidenced by her recent visit to the emergency room. Dr. Hovenic opined that Plaintiff could not walk one city block without rest and stated that she would require a job that permitted shifting between standing and sitting at will. Dr. Hovenic opined that Plaintiff would have to take frequent breaks during an eight-hour workday. Dr. Hovenic reported that Plaintiff required the use of an assistive device with occasional standing or walking. Dr. Hovenic opined that Plaintiff could occasionally lift and carry up to ten pounds. Dr. Hovenic opined that Plaintiff's joint pain would cause significant limitations in her ability to repetitively reach, handle, or finger. Dr. Hovenic opined that Plaintiff could bend or twist at the waist less than five percent during an eight-hour workday. Dr. Hovenic opined that Plaintiff should avoid all exposure to fumes, odors, dusts, gases, cigarette smoke, and soldering fluxes; and should avoid concentrated exposure to extreme cold and heat, high humidity, perfumes, solvents, cleaners, and chemicals. Dr. Hovenic opined that Plaintiff would be absent from work about once a month because of her impairments or treatment therefor. Dr. Hovenic also

opined that Plaintiff's hyperopia[2] and depression would affect her ability to work. (Id. at 476-81.)

On December 7, 2011, Plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff's presenting complaint was that she thought she was crazy. Plaintiff reported having intrusive and obsessive thoughts that appeared to be increasing as she aged. Plaintiff also reported that she thought other people laughed at her and judged her negatively. Dr. Maria Gutierrez noted Plaintiff's past mental and physical history. Plaintiff reported that she and her husband live in the basement of her son's house and that she stays in bed most of the day and watches television. Plaintiff reported that she does not get up unless she needs to go somewhere. Plaintiff reported that she bathes once every two or three weeks. Plaintiff reported that she does the laundry and that she and her husband both clean and do the shopping. Plaintiff reported that her family thinks she engages in hoarding activities and admitted that she has a lot of things. Mental status examination showed Plaintiff to be somewhat disheveled. No problems were noted with Plaintiff's gait. Plaintiff's mood was labile and her affect tearful. Plaintiff denied any visual or auditory hallucinations. Plaintiff appeared to be of average intelligence with adequate abstract reasoning skills. Plaintiff was also noted to have appropriate social norm awareness. Plaintiff's concentration was noted to be strong, and she was able to perform simple math equations in her head. Upon conclusion of the evaluation, Dr. Gutierrez diagnosed Plaintiff with anxiety disorder, not otherwise specified, with a secondary diagnosis of paranoid personality disorder. Dr. Gutierrez assigned a Global

---

[2] Farsightedness. *Stedman's Medical Dictionary* 742 (25th ed. 1990).

Assessment of Functioning score of 60. Dr. Gutierrez opined that Plaintiff was inconsistent with her abilities to perform activities of daily functioning given her inconsistency with caring for her personal hygiene. Dr. Gutierrez opined that Plaintiff had adequate skills in social functioning and adequate concentration. Dr. Gutierrez opined that Plaintiff could understand, remember, and carry out simple instructions and could understand and remember detailed instructions. Dr. Gutierrez opined that Plaintiff's ability to adapt to a work environment was poor because of her anxiety. (Id. at 469-74.)

### ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since July 1, 2010, the date Plaintiff filed the instant application for benefits.[3] The ALJ found Plaintiff's HIV, COPD, depressive disorder, anxiety disorder, developmental reading and writing disorder, and obesity to be severe impairments but that Plaintiff's impairments, either singly or in combination, did not meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1. (Id. at 15-19.) The ALJ found Plaintiff to have the RFC to perform light work, except

> she can only occasionally climb, stoop, kneel, crouch, and crawl. She should avoid all concentrated exposure to irritants such as fumes, odors, mold, gases, and poorly ventilated areas. The claimant is further limited to simple, routine tasks where she can carry out non-detailed instructions. The claimant can work in a low stress job, defined by me as requiring only occasional decision-making, changes in the work setting, and judgment on the job. Furthermore, she can only occasionally interact with the public, coworkers, and supervisors.

---

[3] To be eligible for SSI benefits, a claimant must show that she was under a disability while her application was pending. Benefits cannot be paid for the month in which the SSI application is filed or for any months before that month. 20 C.F.R. §§ 416.330, 416.335.

(Id. at 19.)

The ALJ found Plaintiff not to have any past relevant work. Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that Plaintiff could perform work as it exists in significant numbers in the national economy, and specifically, plastic products assembler, electronics accessory assembler, and automobile parts assembler. The ALJ thus found Plaintiff not to be under a disability since July 1, 2010. (Id. at 19-25.)

### Additional Evidence Before the Appeals Council[4]

On August 24, 2010, Plaintiff underwent a sleep study for symptoms of snoring, apnea, and daytime sleepiness. The results of the study showed Plaintiff to have mild obstructive sleep apnea. It was noted that factors such as obesity, thyroid disease, or abnormalities in the upper airways could be contributory. (Id. at 504-07.)

In a letter dated April 11, 2012, Dr. Hovenic clarified some of his findings and opinions as stated in his November 1, 2011, RFC Questionnaire. Specifically, in his letter, Dr. Hovenic stated that:

- he reviewed Dr. Salzer's treatment records and consulted with Dr. Salzer before completing the Questionnaire;

- Plaintiff's COPD causes ongoing shortness of breath that is exacerbated by activity resulting in quite limited ambulatory ability;

---

[4] In making its determination to deny review of the ALJ's decision, the Appeals Council considered additional evidence which was not before the ALJ. The Court must consider this additional evidence in determining whether the ALJ's decision was supported by substantial evidence. **Frankl v. Shalala**, 47 F.3d 935, 939 (8th Cir. 1995); **Richmond v. Shalala**, 23 F.3d 1441, 1444 (8th Cir. 1994).

- Plaintiff's EDS causes joint instability resulting in symptoms of pain and swelling in the joints and experienced by Plaintiff in her arms, legs, shoulders, and hips;

- Plaintiff's EDS symptoms are worse during activity and are best treated with NSAIDs, such as Aleve, and with limited periods of activity;

- Plaintiff's diagnosis of obstructive sleep apnea was confirmed with a sleep study in 2010 and causes excessive daytime sleepiness and fatigue, but that Plaintiff cannot afford a CPAP machine; and

- Plaintiff's depression symptoms include sleep disturbance, fatigue, loss of interest in activities, and difficulties attending and concentrating.

(Id. at 485-86.)

## Discussion

To be eligible for SSI under the Social Security Act, Plaintiff must prove that she is disabled.  **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001); **Baker v. Secretary of Health & Human Servs.**, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. § 416.920; **Bowen v. Yuckert**, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); **Richardson v. Perales**, 402 U.S. 389, 401 (1971); **Estes v. Barnhart**, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. **Johnson v. Apfel**, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." **Coleman v. Astrue**, 498

F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." **Id.** (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The Plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the Plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

**Stewart v. Secretary of Health & Human Servs.**, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. **Coleman**, 498 F.3d at 770; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. **Pearsall**, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the

record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." **Weikert v. Sullivan**, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also **Jones ex rel. Morris v. Barnhart**, 315 F.3d 974, 977 (8th Cir. 2003).

Opinion Evidence. Plaintiff claims that the ALJ erred in not according controlling weight to the opinion of Plaintiff's treating physician, Dr. Hovenic, and failed to articulate good reasons to discount the opinion. For the following reasons, the ALJ did not err in the weight he accorded Dr. Hovenic's opinion.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. § 416.927(f)(2)(ii).[5] The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. § 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Id.; see also **Forehand v. Barnhart**, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence

---

[5] Citations to 20 C.F.R. § 416.927 are to the 2011 version of the Regulations, which were in effect at the time the ALJ rendered the final decision in this cause. This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change the substance therein.

that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(d)(2).

However, a medical source's opinion that an applicant is unable to work involves an issue reserved for the Commissioner and is not the type of opinion which the Commissioner must credit. **Ellis v. Barnhart**, 392 F.3d 988, 994-95 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 416.927(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. Id. The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." Id.

In his written decision here, the ALJ determined to accord little weight to the opinions expressed in Dr. Hovenic's November 2011 RFC Questionnaire, noting the opinions therein to be inconsistent with the medical evidence of record. The ALJ also found that Dr. Hovenic failed to provide support for his opinions and further noted that, although identified by Plaintiff as a treating source, the record contains no treatment notes from him. Because these reasons are supported by substantial evidence on the record as a whole, the ALJ did not err in discounting the opinions expressed in Dr. Hovenic's

Questionnaire.

With respect to Dr. Hovenic's status as a treating source, the undersigned notes the record to show that Dr. Hovenic was an attending physician with Dr. Salzer during Plaintiff's October 2011 follow up examination. (See Tr. at 461-62.) No other treatment records appear in evidence, however, showing Dr. Hovenic to have been involved in Plaintiff's treatment. Although Dr. Hovenic states that he was an attending physician with Dr. Salzer for two years, there is no indication in the record that he attended with Dr. Salzer in relation to Plaintiff's treatment except for the October 2011 appointment. Given the lack of a longitudinal treatment relationship between Plaintiff and Dr. Hovenic, the ALJ did not err in according less than controlling weight to Dr. Hovenic's opinions. See 20 C.F.R. § 416.927(d)(2)(i); **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007); **Nishke v. Astrue**, 878 F. Supp. 2d 958, 982 (E.D. Mo. 2012).

Regardless, as noted by the ALJ, a review of the medical record in its entirety shows Plaintiff not to have experienced the restrictive limitations as expressed in Dr. Hovenic's opinion. With respect to the opined postural and manipulative limitations, physical examinations documented in Drs. Salzer's and McCrary's treatment notes consistently show Plaintiff to exhibit no evidence of joint pain or instability. Plaintiff's examination on October 11, 2011, at which Dr. Hovenic attended, yielded the same normal results. Likewise, physical examinations conducted with each of Plaintiff's hospital visits show no evidence of joint pain or instability or any other remarkable findings relating to Plaintiff's extremities or musculoskeletal features. To the extent Plaintiff complained of swelling in her feet in May and July 2010 and of pain in her leg in

June 2011, such symptoms were determined to be associated with acute conditions of gout and phlebitis and did not continue in duration nor require additional treatment. To be entitled to substantial or controlling weight, a medical opinion must be well-supported by medical evidence, "particularly medical signs and laboratory findings." 20 C.F.R. § 416.927(d)(3). See also **Hacker v. Barnhart**, 459 F.3d 934, 937 (8th Cir. 2006). No such medical signs or laboratory findings support the limitations as opined by Dr. Hovenic. An ALJ does not err in according less than controlling weight to a treating physician's opinion regarding a claimant's limitations where none of the claimant's treatment records note such limitations. **Charles v. Barnhart**, 375 F.3d 777, 784 (8th Cir. 2004). See also **Hogan v. Apfel**, 239 F.3d 958, 961 (8th Cir. 2001) (where limitations set out in treating physician's assessment "stand alone" and were never mentioned in the numerous records nor supported by any objective testing or reasoning, ALJ did not err in discounting physician's statement).

The same holds true for Dr. Hovenic's opined limitations caused by Plaintiff's COPD. Although Dr. Hovenic reported that Plaintiff's ambulatory ability was limited because of her shortness of breath, he gives no opinion as to how long Plaintiff could walk during an eight-hour workday because he "could not find any references to it in the chart." (See Tr. at 479.) In addition, as noted by the ALJ, Dr. Hovenic provides no support for his opinion that Plaintiff's shortness of breath correlated to a need for a low stress job. Given such inconsistencies and lack of support in the record, the ALJ did not err in discounting Dr. Hovenic's opinions regarding the extent of Plaintiff's respiratory limitations. 20 C.F.R. §§ 416.927(d)(3), 416.927(d)(4); **Goff v. Barnhart**, 421 F.3d 785, 790-91 (8th Cir.

2005).

A review of the ALJ's decision shows the ALJ to have evaluated all of the evidence of record and to have provided good reasons for the weight accorded to the opinions expressed in Dr. Hovenic's November 2011 RFC Questionnaire. Given the functional restrictions included in the ALJ's RFC assessment, however, including significant postural, environmental, and mental restrictions, it cannot be said that the ALJ rejected Dr. Hovenic's opinion in its entirety. See **Ellis**, 392 F.3d at 994. For the reasons set out above, substantial evidence on the record as whole supports the ALJ's determination to accord little weight to Dr. Hovenic's opinion evidence and to not include all of the limitations as opined by Dr. Hovenic in Plaintiff's RFC.[6]

Consideration of Impairments in Determining RFC. Plaintiff claims that the ALJ failed to consider the effects of all of Plaintiff's impairments in making his RFC determination, specifically arguing that the ALJ failed to consider the effect of Plaintiff's obesity on her ability to work and especially when considered in combination with Plaintiff's EDS and sleep apnea.

To the extent Plaintiff argues, first, that the ALJ failed to consider the effects of her sleep apnea and EDS in determining her RFC, a review of the ALJ's decision shows the ALJ to have indeed considered such impairments, finding the evidence of record not to

---

[6] To the extent Plaintiff argues that the ALJ improperly substituted Dr. Knight's 1992 psychological assessment for Dr. Hovenic's 2011 treating source opinion, a review of the ALJ's decision shows no such "substitution" to have occurred. Indeed, as acknowledged by Plaintiff, the 1992 assessment was offered to explain Plaintiff's limitations in reading and writing, and the ALJ accorded great weight to such opinion. Unlike Dr. Hovenic, Dr. Knight imposed no physical restrictions on Plaintiff's ability to perform work-related activities.

support a finding that the impairments caused more than minimal limitations in Plaintiff's ability to perform work-related activities. (Tr. at 17.) This finding is supported by substantial evidence on the record as a whole. As noted by the ALJ, Plaintiff took only over the counter medication for any joint pain, and no physician imposed any restrictions on Plaintiff due to EDS.[7] Further, as discussed *supra*, no medical evidence of record shows Plaintiff to have experienced any limitations because of EDS. With respect to Plaintiff's sleep apnea, while the ALJ did not have the results of the sleep study before him at the time he rendered his decision, he nevertheless noted the record to lack objective evidence that Plaintiff suffered more than minimal limitations on account of such impairment. While Plaintiff intermittently complained of fatigue in early 2010, the record shows Plaintiff to have been diagnosed with mild sleep apnea in August 2010 and not to have complained of fatigue thereafter. <u>Contra</u> **Leckenby v. Astrue**, 487 F.3d 626, 633 (8th Cir. 2007) (claimant diagnosed with severe sleep apnea and medical records replete with consistent complaints of chronic fatigue and non-restorative sleep at night). Nothing in the record shows Plaintiff to have been prescribed any medication or other modality to assist with sleep difficulties or fatigue. Little medical evidence supports Plaintiff's allegations that sleep apnea caused her to experience symptoms after July 1, 2010, so significant that she was functionally restricted in her ability to perform work-related activities. The ALJ nevertheless considered this claimed impairment. <u>Cf.</u> **Weise v.**

---

[7] To the extent Dr. Hovenic's November 2011 Questionnaire can be said to impose such restrictions, the ALJ properly discounted Dr. Hovenic's opinions relating thereto for the reasons set forth above.

**Astrue**, 552 F.3d 728, 732-33 (8th Cir. 2009).

Finally, a review of the ALJ's decision shows the ALJ to have properly considered Plaintiff's obesity in determining her RFC. "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat." Social Security Ruling (SSR) 02-1p, 2000 WL 628049, at *2 (Soc. Sec. Admin. Sept. 12, 2002). Guidelines published by the National Institutes of Health establish medical criteria for the diagnosis of obesity, including a classification that a BMI of 30.0 or above constitutes "obesity." Id.

The record establishes, and the Commissioner does not dispute, that Plaintiff suffers from obesity. Although obesity is no longer, in itself, a listed impairment, see SSR 02-1p, 2000 WL 628049, at *1, the Social Security Regulations specifically instruct that the cumulative effects of obesity must be considered with a claimant's other impairments. See, e.g., 120 C.F.R. 404, Subpart P, App. 1, §§ 1.00(Q), 3.00(I), 4.00(I)(1). When an ALJ takes a claimant's obesity into account during the claim evaluation process, such review may be sufficient to avoid reversal. **Heino v. Astrue**, 578 F.3d 873, 881 (8th Cir. 2009); see also **Brown ex rel. Williams v. Barnhart**, 388 F.3d 1150, 1153 (8th Cir. 2004) (finding that ALJ adequately considered obesity when he referred to it in evaluating claimant's case).

Here, in his sequential analysis, the ALJ identified Plaintiff's obesity as a severe impairment and, citing SSR 02-1p, considered the effects of her obesity in addition to her other impairments when determining her RFC. "The claimant's obesity has been considered in combination with the claimant's other established impairments and all limitations thereof have been incorporated into the residual functional capacity detailed

above." (Tr. at 21.)  Because the ALJ specifically took Plaintiff's obesity into account and combined this discussion with his summary of the medical evidence of record relating to all of Plaintiff's impairments, it cannot be said that the ALJ failed to properly consider the effect of Plaintiff's obesity on her RFC.  **Heino**, 578 F.3d at 881-82.  Plaintiff's claim otherwise therefore fails.

## Conclusion

For the reasons set out above, the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence on the record as a whole.  Inasmuch as substantial evidence on the record as a whole supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court might have reached a different conclusion.  **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001); accord **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and this action is dismissed with prejudice.

A separate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  7th  day of February, 2014.